IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

A.M., an individual;                    )
                                        )
      Plaintiff,                        )
                                        )   Docket No.: _____( )
v.                                      )
                                        )   *Plaintiff's Demand*
SC HOTEL INVESTMENTS, LLC;              )    *a Trial by Jury*
                                        )
      Defendant.                        )

---

# COMPLAINT

---

Matthew B. Stoddard
Patrick J. Hannon
THE STODDARD FIRM
1534 N Decatur Road
Atlanta, GA 30307
P: 470-467-2200
F: 470-467-1300
matt@legalhelpga.com
pat@legalhelpga.com

**Attorneys for Plaintiff**

# TABLE OF CONTENTS

I.      Introduction...............................................................................................................3

II.     Procedural Issues and Parties...................................................................................6

III.    Facts........................................................................................................................7

        a.      Plaintiff is trafficked for sex at Defendant's
                motel when she is 14 and 15 years old..........................................................7

        b.      Chandresh Patel creates the Queen City Drive motels venture..................13

        c.      Defendant's extensive knowledge of
                the venture's involvement in sex trafficking................................................15

        d.      Information Regarding Defendant's Quality Inn,
                and Plaintiff's Experience was Not Unique..................................................28

        e.      Defendant's Knowledge as to Plaintiff.........................................................32

IV.     Count 1: TVPRA Civil Beneficiary Claims............................................................35

        a.      Venture 1 (Defendant and Traffickers) .......................................................35

        b.      Venture 2 (Queen City Drive Motels) .........................................................39

V.      Count 2: Premises Liability Law............................................................................41

VI.     Causation And Damages.........................................................................................44

VII.    Jury Trial................................................................................................................45

VIII.   Prayer For Relief....................................................................................................45

# I. INTRODUCTION

1.      This case involves the sex trafficking of a minor – namely Plaintiff A.M. – at a notorious Charlotte motel.

2.      The motel at-issue is the Quality Inn located at 3100 Queen City Drive, Charlotte, North Carolina.

3.      In 2008, Chandresh Patel bought the Quality Inn and a Red Roof franchise next door. Patel placed titled to the Quality Inn in Defendant SC Hotel Investments LLC, and title to the Red Roof in another company. He and his wife were the only owners of both companies, so he had exclusive control over the two motels. Chandresh Patel ran both motels, imposed materially the same policies at both, and used some of the same personnel to work for both motels.

4.      Chandresh Patel (and most other people in Charlotte) knew that the motels were located in an area of Queens City Drive in Charlotte that is known for drugs and prostitution. Moreover, the Quality Inn itself was a known hotspot for drugs, prostitution, sex trafficking, and violent crime.

5.      Defendant was aware of the Quality Inn's reputation, but, instead of acting, chose to do nothing; thereby creating a safe space for those seeking to commit crimes without fear of detection or consequence. Defendant then profited off the increased room rentals this system created (i.e. creating a safe space for drug trafficking, human trafficking, commercial sex, and other crime).

6.     Defendant was warned on numerous occasions prior to and during Plaintiff's trafficking by law enforcement, motel guests, and the overwhelming and unignorable presence of crime at the motel that the Quality Inn was a haven for drugs, prostitution, sex trafficking, and other violent crime.

7.     Given the above, Defendant knew or should have known that changes had to be made at the motels. However, instead of contacting law enforcement, hiring appropriate security, or taking other reasonable measures to deter crime, Defendant chose to profit from the room revenues brought in by those seeking to commit crime(s), and to provide cover for criminals seeking a place free of repercussion(s). As a direct and foreseeable result of Defendant's actions and inactions, the then-minor Plaintiff in this case was brought to Defendant's Quality Inn to be trafficked, beaten, threatened, repeatedly raped, and sold for sex.

8.     Defendant had every reason to know what was happening to this specific Plaintiff and that it was facilitating her trafficking. When Plaintiff was brought to Defendant's motel, the following occurred:

a.  Defendant's front desk employee steered Plaintiff and her trafficker to areas of the motel where law enforcement was less likely to be present;

b.  The motel agreed that there would be no housekeeping to Plaintiff's trafficker's room during her stays;

c.  Instead, the trafficker himself would pick up towels and sheets each day for multiple days in a row in the lobby;

d.  The trafficker left trash cans full of used condoms for housekeeping;

e.  Many men per night would drive into the motel, park near Plaintiff's room, walk into Plaintiff's room, and stay for only 15 to 20 minutes before leaving and driving out of the parking lot in full view of motel staff;

f.  The trafficker forced Plaintiff and another 17-year-old girl to wear revealing clothing and keep their head down anytime they were not in the motel room;

g.  The trafficker would loudly beat, threaten, bruise, and argue with Plaintiff and the 17-year-old victim such that motel employees and others could hear and see said events and injuries and then the staff would continue to rent the room to the trafficker;

h.  The trafficker would regularly and repeatedly wait outside Plaintiff's room to collect money from "johns" visiting Plaintiff for sex; and

i.  The motel staff would often not call police despite have information that crimes were occurring at the property.

9.      In short, Defendant profited not just from the room rentals of the unsavory element it attracted with its policies, Defendant also knew and had every reason to know that it was profiting from the sex trafficking of this then-minor Plaintiff, and then with that knowledge, the Defendant aided in providing Plaintiff's trafficker a safe space to operate that catered to his needs.  As such, Defendant is liable for Plaintiff's damages under 18 U.S.C. § 1595(a) (the "TVPRA") and North Carolina's premises liability law.

## II. PROCEDURAL ISSUES AND PARTIES

10. Given the nature of the case, A.M. is identified in this Complaint by her initials to prevent public disclosure of her name. Plaintiff's counsel will disclose her full name to defense counsel. Separately, Plaintiff has filed a Motion for Protective Order seeking Court permission for Plaintiff to proceed anonymously.

11. A.M. is a natural person who is currently a resident and citizen of North Carolina.

12. Defendant SC Hotel Investments LLC is a North Carolina limited liability company with its principal place of business at 1719 Funny Cide Drive, Waxhaw, North Carolina 28173.

13. Defendant SC Hotel Investments LLC can be served with the complaint and summons through its registered agent, Chandresh Patel, at 1719 Funny Cide Drive, Waxhaw, North Carolina 28173.

14. Defendant SC Hotel Investments LLC was properly served with process in this matter.

15. Defendant SC Hotel Investments LLC is subject to the jurisdiction and venue of this Court.

16. Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question jurisdiction) because this matter concerns the Trafficking Victims Protection Reauthorization Act ("TVPRA") a/k/a 18 U.S.C. § 1595, *et sec*., which is/are law(s) of the United States.

17.     Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in Charlott, North Carolina which is within the Western District of North Carolina.  *See* 28 U.S.C. § 1391.

### III. FACTS

**a.  Plaintiff is trafficked for sex at Defendant's motel when she is 14 and 15 years old.**

18.     In approximately mid to late-2014, Plaintiff met Samual Pratt.

19.     Plaintiff was 14 years old when Pratt began trafficking her for sex out of hotels in Charlotte, North Carolina, including Defendant's Quality Inn.

20.     Plaintiff was also trafficked out of South Carolina and New York, but most of the trafficking occurred in Charlotte.

21.     During the time period that Pratt trafficked Plaintiff, Pratt, also trafficked a 17-year-old female.[1] Pratt often trafficked the 17-year-old and Plaintiff out of the same motel room.

22.     At times during the trafficking period, Pratt was assisted in his trafficking of Plaintiff by Pratt's family members and by an adult female prostitute who acted as his "bottom"—a term for a prostitute working under a trafficker who also has responsibility for overseeing the trafficker's other victims and performs tasks such as advertising, collecting money, and punishing victims who do not follow the trafficker's rules. This

---

[1] Documents from Pratt's federal criminal prosecution identify this trafficking victim as being 17 years old at the end of the trafficking period alleged in this complaint. Plaintiff does not know this victim's birthdate, but it is likely that she was even younger than 17 during much of the trafficking.

woman took photos of Plaintiff wearing very little clothing and posted them on Backpage.com to advertise Plaintiff for commercial sex.

23.     When the "johns" responded to the backpage.com postings, Pratt would direct them to a motel room that he rented for the purpose of trafficking Plaintiff for sex.

24.     Pratt was a "gorilla pimp," meaning he used brute force and violence to enforce his rules and control his trafficking victims. If Plaintiff resisted or objected to his commands or rules, she was met with threats of violence or actual violence, such as beating her or choking her.

25.     Pratt's violence a time left visible bruises/marks on Plaintiff that were visible to anyone who saw her, including staff at the Quality Inn. Pratt's violence also left visible marks on the 17-year-old.

26.     On several occasions, Pratt took Plaintiff and the 17-year-old to the Quality Inn and commanded Plaintiff and 17-year-old to have sex with many strange men per night.

27.     In exchange for sex with the then-underaged Plaintiff, the above-mentioned men or "johns" would pay Pratt for their visit or "date" with Plaintiff. Pratt then used the money earned from Plaintiff's commercial sex—and from the commercial sex of Pratt's other victim to pay for the rooms at the Quality Inn.

28.     At all times during Plaintiff's trafficking period, Pratt would keep all of the money A.M. made engaging in commercial sex; he or his co-traffickers were always watching or within a short distance of Plaintiff; he would threaten her if she were to tell

anyone about her situation; and he physically harmed Plaintiff by hitting or choking her when she would not submit to his will or engage in commercial sex.

29.     Pratt also kept A.M. under the influence of illegal drugs to further keep her under control, to lower her resistance to having sex with the strange men, and to enable her to "work" many hours without stopping to sleep.

30.     Pratt trafficked Plaintiff for commercial sex at a few different hotels in Charlotte area, staying at one for a period of time before moving on to another.

31.     Pratt took Plaintiff Defendant's Quality Inn to traffic her for sex on several occasions.

32.     Pratt would stay at Quality Inn with Plaintiff for days or weeks at a time.

33.     Pratt was a frequent customer of the Quality Inn and was known to employees at the Quality Inn.

34.     Pratt would pay for his stays at the Quality Inn in cash, typically paying for his room one day at a time, returning each day to pay for one more day.

35.     Pratt trafficked Plaintiff for sex out of the Quality Inn on numerous occasions, and Pratt was a well-known customer to the staff at the motel.

36.     Pratt would rent a room at the Quality Inn and use that room as a location to traffic Plaintiff and the 17-year-old girl.

37.     Pratt trafficked Plaintiff and the 17-year-old girl with the help of his "bottom," so at times there were four people coming and going from the room (Pratt, his "bottom," Plaintiff, and the 17-year-old).

38. Plaintiff, who was 14 at the begging of the trafficking period and 15 at the end, appeared young—too old to be Pratt's daughter and too young to be his partner.

39. When Plaintiff stayed at the Quality Inn, the following occurred:

   a. On her way to or from the room and at other times Plaintiff was outside the room, Plaintiff was instructed to keep her head down and not speak to anyone – including Defendant's employees.

   b. When Plaintiff and the 17-year-old were in parking lot or common areas of the motel, they appeared:

      i. Dressed inappropriately in provocative and revealing clothing;

      ii. At times displaying bruising and scars;

      iii. To be under the influence of drugs; and

      iv. To be obviously underage.

   c. During Plaintiff's stays at the Quality Inn, Pratt arranged with Defendant to suspend housekeeping services.

   d. Even though he refused housekeeping services, Plaintiff's trafficker requested new towels and sheets multiple times.

   e. Because housekeeping had been forgone for days at a time, Plaintiff's trafficker left outside the room trash bags full of used condoms, which housekeeping would see and have to dispose of.

f.  While each of the many men came to Plaintiff's room to have sex with her, Pratt would wait outside her room or in the parking lot, which was in clear view of housekeeping, maintenance, and other staff.

g.  Plaintiff's traffickers would become angry and abusive towards Plaintiff and the 17-year-old, and would yell or fight in a manner that others, including motel staff, could hear.

40.  Pratt took the money that he was paid for Plaintiff's commercial sex and paid it to the motel to pay for subsequent nights at the motel.

41.  The "johns" who visited Plaintiff's motel room to have commercial sex with Plaintiff or the 17-year-old girl had to drive into the parking lot where the front desk worker and other employees could see them coming into the motel and parking near Plaintiff's room. The front desk workers and other employees could also see multiple "johns" getting out of the vehicles walking to Plaintiff's room, and walking back to their car a short time later and driving out of the motel.

42.  There were typically over five Johns who came to Plaintiff's room each night to have sex with her, and about the same number for the 17-year-old girl. On some evenings, however, Pratt would require that Plaintiff and the 17-year-old girl take drugs that would enable them to work longer periods of time, and there would be even more foot traffic to the motel room those nights.

43.  Pratt took Plaintiff and the 17-year-old to a hotel in Columbia, South Carolina, to traffic them for sex. On January 1, 2016, sheriff's deputies responded to a

domestic disturbance call at that hotel. When deputies arrived, they saw Pratt, who was 33 at the time, in the hotel room with Plaintiff (who was then 15) and the 17-year-old. Deputies observed that Pratt had provided alcohol to the two. Deputies arrested Pratt for contributing to the delinquency of minor and on a firearms charge for the pistol recovered from his vehicle.

44.     Shortly after that arrest, Pratt bonded out and returned to sex trafficking.

45.     On February 3, 2016, FBI conducted a sting at the same Columbia, South Carolina, hotel. An undercover FBI agent responded to a backpage.com posting that advertised the 17-year-old for commercial sex. FBI agents responding to the hotel encountered Pratt and the 17-year-old. Both were interviewed, but Pratt was not arrested at that time.

46.     On April 4, 2016, when Plaintiff was 15 years old, the U.S. government arrested Pratt the final time on a warrant issued from this district in Case No. 3:16-cr-00207-TLW. Pratt did not make bond in federal court.

47.     The Second Superseding Indictment in Case No. 3:16-cr-00207-TLW charged Pratt with sex trafficking of Plaintiff and the 17-year-old in violation of 18 U.S.C. § 1591(a) relating to his January 1 arrest, and similar charges relating to the February 3 arrest, among other charges.

48.     A jury convicted Pratt on eight counts on December 9, 2016. The Fourth Circuit vacated two counts of Pratt's conviction based on a Fourth Amendment violation, but affirmed the other counts. Upon resentencing, Pratt was sentenced to life in prison.

**b. Chandresh Patel creates the Queen City Drive motels venture.**

**1. Quality Inn Charlotte Airport**

49.     In April 2007, Chandresh Patel and Alpa Patel formed Shreeji Hospitality Airport LLC, a member-managed North Carolina limited liability company. Chandresh and Alpa Patel also are the only members of this LLC. Both are managing members.

50.     In January 2008, Chandresh and Alpa Patel, through Shreeji Hospitality Airport LLC, purchased the Quality Inn Charlotte Airport (the "Quality Inn" or the "motel") located at 3105 Queen City Dr.,  Charlotte, NC 28208.

51.     From January 2008 to February 2016, Shreeji Hospitality Airport LLC held title to the Quality Inn, and Chandresh and Alpa Patel owned and controlled the Quality Inn through Shreeji Hospitality Airport LLC. (Although on April 20, 2016, Chandresh Patel changed the name of the company to SC Hotel Investments LLC, which is the name the company uses now.)

**2. The Charlotte Red Roof**

52.     In July 2008, Chandresh Patel and Alpa Patel formed Shreeji Hospitality Queen City LLC, a member-managed North Carolina limited liability company. Chandresh and Alpa Patel also are the only members of this LLC. Although Chandresh Patel may have been the only initial managing member, both eventually became managing members.

53.     In September 2008, Chandresh and Alpa Patel, through Shreeji Hospitality Queen City LLC, purchased a motel (the "Red Roof Inn") located at 3300 Queen City Dr, Charlotte, NC 28208, which was at the time a Red Roof Inn.

54.     From September 2008 to approximately July 2016, Shreeji Hospitality Queen City LLC held titled to the Red Roof Inn, and Chandresh and Alpa Patel owned and controlled the Red Roof Inn through Shreeji Hospitality Queen City LLC. On January 27, 2016, Chandresh and Alpa Patel voted to change the name of the company to Lakepointe Hotel Investments LLC, but the amendment changing the company named did not become effective until it was filed on January 5, 2017.

### 3.  Patel operates the Queen City Drive motels as one venture.

55.     After purchasing the Quality Inn and the Red Roof Inn in 2008, Chandresh Patel, as a managing member for the LLCs that owned each motel, began running the motels together as part of the same undertaking.

56.     The motels lent themselves to being run together because they are both budget motels and are situated approximately 600 feet apart at the same exit off of Interstate 85—the Red Roof Inn on one side of the road and the Quality Inn on the other.

57.     Patel hired a Sales Director and tasked her with increasing sales at the motels and marketing the motels to potential guests. Patel also charged the Sales Director with maintaining existing clients of the motels as return customers and with supervising and training the front desk staff of the motels to maximize sales.

58.     Red Roof Inn and the Quality Inn also shared the some of the same security personnel. Chandresh Patel, himself or through an intermediary, supervised and managed the security for both motels.

59. Patel, himself and through his agents, supervised and managed the motels jointly, using very similar policies and operating procedures for both motels, and promoting the two motels together. Because Patel and his wife were the sole owners of both motels, they used the same supervisory, sales, and security structure for both motels to maximize revenue, minimize expenses, and thereby maximize their profits.

**c. Defendant's extensive knowledge of the venture's involvement in sex trafficking.**

60. Patel and his employees knew that drug crime and commercial sex were commonplace at both motels.

61. From the first year of ownership or before, Defendant knew that the Quality Inn and the Red Roof Inn were located in an area where drugs and commercial sex were rampant. Defendant knew that from several sources including:

a. Defendant's employees and Chandresh Patel had experience in the hospitality industry and therefore knew that commercial sex was a problem facing the industry and that it was a particularly acute problem for budget hotels such as the Quality Inn and the Red Roof Inn.

b. Patel set room rental prices for both motels at or near the lowest among all national franchises in the area, knowing that such price positioning brought with it increased crime, especially commercia sex and illegal drugs.

c. Defendant received communications from the motel's franchisor in the form of emails, customer complaints, and other feedback that informed Defendant about the problems at the motel; and

d.  Defendant received online reviews, and sometimes responded to online reviews that informed Defendant of the problem with commercial sex and other crimes.

## 1. Online Reviews

62.   The online reviews for the Quality Inn included the following:

a.  "I'm pretty sure this hotel is in an extremely rough area. A woman who I'm almost positive was a prostitute on the street corner, police in the hotel parking lot one morning searching an individual, suspect individuals walking around at virtually all times of night (the door access is on the outside, vs. the inside of the hotel, so you can pretty easily hear everyone outside), etc...." (TripAdvisor, August 2012)

b.  "[L]ooked like a half way house as there seems to be plenty of very long term tenants staying there. several groups of a younger generation just to play in the pool. a walking security guard is some what discerning in several aspects. keep your eyes open i guess...." (TripAdvisor, August 2012);

c.  "Our room was on the backside of the hotel and it was dark and creepy. We saw numerous people standing on the outside walkway smoking and a couple people drinking beer and smoking. It almost seemed like people were living there? I would not recommend this hotel to anyone and especially not families. The police visited a neighboring room also." (TripAdvisor, __);

d.  "...sketchy people hanging around.... it was in the same class as some no name hooker motel. Would not stay here again, EVER!! Wish I could get my money refunded." (TripAdvisor, July 2014);

e.  "I made the mistake of staying at this hotel. There are people who stay there, who live there. Very shady people...." (TripAdvisor, June 2014);

f.  "...Worst of all was what sounded like gang violence at 2am in the parking lot!..." (TripAdvisor, February 2015)

g.  "....The convenience store next door was fronted by a homeless person screaming at people as you came and went, somewhat threateningly. I can deal with that. But the mini-riot of a dozen people or more at 2:30, screaming,

cursing, fighting, waking the entire back of the hotel? No thank you..."
(TripAdvisor, May 2015);

h. "....Officer advised me hotel is a haven for criminal activity. Stay away!!!..."
(TripAdvisor, June 2015);

i. "[T]his is one of the worst hotels I've ever seen....And to top it all off as I was
checking out, the police were leaving after having thrown out a prostitute. I
called the Choice Hotel customer service line the next day who, after hearing
all this, immediately refunded my money...." (Google, approximately 2015)

63.     Defendant policy required that Quality Inn managers and assistant managers

monitor the online reviews, which they did. Defendant employees also responded

periodically to reviews, so Defendant was well aware of the content of its online reviews.

64.     Most of the reviews for the Red Roof Inn are no longer publicly available,

but an affidavit of an FBI agent filed in this Court in a separate case quotes several reviews

for the Red Roof Inn that were publicly available before Plaintiff's trafficking, including:

a. "This hotel is a drug and prostate [sic] hang out would not recommend this
to anyone rooms aren't bad but. It is just too dangerous to stay at this hotel
the Charlotte Police Department need to clean this place up disgusting all I
smell is marijuana and see prostitutes everywhere trying to give out their
phone numbers and find out what room you're in". (TripAdvisor, September
2014)

b. "Might be my worst experience at a hotel EVER! Had made a reservation
through the Red Roof hotline. Arrived and noticed I may be in the ghetto. I
checked in to my supposed to be non-smoking room and it was filled with
smoke....Meanwhile. Marijuana started to stream through the bathroom from
a vent...." (Tripadvisor, May 2014)

c. "They have junkies and crackheads knocking on your door and stuff not a
good experience" (Hotels.com, April 2014)

65.     Additionally, the few Yelp reviews for the Red Roof that are available include

this April 9, 2015, review:

"Ok so I used to work front desk here red roof has came its way
all the rooms are remodeled got rid of roach rats and bed bugs
and pumps and hoes lol now its a lot better if you are trying to
get on your feet great place to start off 69 per night."

66.     Chandresh Patel and managers of the Red Roof Inn also monitored the online

review of that motel and were aware of the content of its online reviews.

## 2. Communications from police

67.     In November 2013, the Charlotte Mecklenburg Police Department told Red

Roof Inn managers that they had designated the Red Roof Inn as a nuisance location

because of the prostitution and drug crime there, among other problems. That designation

meant that the motel would to be monitored by the department's Nuisance Enforcement

Strategy Team (NEST).

68.     The Red Roof Inn managers, who were ultimately controlled by and reported

to Chandresh Patel, responded to the police that they would rent rooms to anyone who

could pay the rent, which was in keeping with the policy set by Patel.

69.     Not surprisingly, sex trafficking at the Red Roof Inn continued. The Quality

Inn had the same problem, but did not become the focus of the NEST unit. Sex trafficking

continued at the Quality Inn as well.

70.     In February 2014, the Nuisance Abatement Coordinator from the Charlotte

Mecklenburg Police Department wrote to and called Chandresh Patel about the increased

crime at the Red Roof Inn but Patel initially ignored the inquiries.

71.     Eventually, Chandresh Patel agreed to meet with Charlotte Mecklenburg Police Department on April 22, 2014. At that meeting, police officers again told Patel, as well as his Director of Operations and General Manager, about the problems that motel had with drugs and prostitution, and officers suggested several motel policy changes to prevent sex trafficking and other crime at the motel, including:

    a.  Maintaining a hotel guest ban book (i.e., a do-not-rent list);

    b.  Performing background checks on motel employees;

    c.  Drug testing motel employees;

    d.  Checking Charlotte Mecklenburg Sheriff's website for guest with warrants or an arrest history;

    e.  Requiring all guests' visitors to check-in at the front office;

    f.  Informing guests of the motel's rules;

    g.  Checking Backpage.com for guests advertising for commercial sex; and

    h.  Prohibiting guests from loitering in the motel parking lot or hallways.

72.     Patel knew that the Red Roof Inn was not the only motel that he controlled on Queen City drive that had a problem with drugs and commercial sex. He knew that the Quality Inn on the other side of the highway was marketed to and had the same clientele and had the same problems. He knew that continuing with his current policies at the two motels would continue to accommodate sex traffickers and that implementing the policies requested by the police would prevent sex trafficking. Despite that knowledge, Patel

refused the police's requested changes and continued to implement the same policies at both motels.

73.     After the April 22, 2014, meeting, Charlotte police officers saw no indication that any of their suggestions were followed at the Red Roof Inn. Therefore, the commercial sex and trafficking continued. Patel also chose not to institute those suggestions at the Quality Inn, and therefore the commercial sex and trafficking continued at that motel as well.

74.     Patel and his subordinates chose not to implement the police's suggestions at either motel because they wanted the revenue that customers involved in commercial sex brought to the motels.

75.     In October 2014, Charlotte police met with Red Roof Inn employees and again recommended the same policy changes to reduce commercial sex and drug activity as they had at the April 2014 meeting. But after that meeting, the police's suggestions again were not implemented, either at the Red Roof Inn or at the Quality Inn.

76.     On September 17, 2015, the U.S. Attorney's Office filed in this district a civil forfeiture action *in rem* against the Red Roof Inn. The complaint alleged that the motel was used or intended to be used to violate federal laws prohibiting sex trafficking, transportation of minors for prostitution, and distribution of controlled substances. The complaint and attached affidavit outlined the Charlotte Mecklenburg Police Department's efforts to notify Patel about the Red Roof Inn's problem with commercial sex and drugs, and summarized numerous reports of sex trafficking at the hotel including:

a. In September 2012, a man named Shahid Muslim was arrested for trafficking a 16-year-old girl and a 17-year-old girl out of the Red Roof Inn. He was later convicted of sex trafficking of a minor in federal court.

b. In July 2013, a pimp named Keshun Rhodes was arrested for prostituting a victim out of the Red Roof Inn. He was later convicted of a Mann Act violation.

c. In April 2015, a pimp named Matin Meggett was arrested charges related to his sex trafficking of a 17-year-old victim at the Red Roof Inn and other hotels. His charges were pending at the time of the affidavit, but he was later convicted.

d. Multiple additional sex trafficking victims reported to the FBI that they had been trafficked out of the Red Roof Inn, at times with the cooperation of Red Roof Inn employees who the traffickers had paid to permit the trafficking at the hotel.

77. Under pressure from the *in rem* action, in July 2016 Chandresh Patel agreed to sell the Red Roof Inn and give $175,000.00 of the proceeds to the U.S. government to settle the forfeiture action.

78. Chandresh Patel also divested of the Quality Inn that year, selling the motel in February 2016 for $4.7 million.

### 3. Law Enforcement Activity at the Quality Inn

79.     Charlotte-Mecklenburg Police Department received a high number of calls for service to the Quality Inn. In the three years from 2014 to 2016, the police received and responded to following reported crimes, among others, at 3100 block of Queen City Drive:

   a.  1 rape

   b.  1 human trafficking/involuntary servitude

   c.  1 missing person found

   d.  2 armed robberies

   e.  2 strong arm robberies

   f.  1 sudden death investigation

   g.  2 aggravated assaults with a knife

   h.  4 Narcotics violations for Opiates

   i.  2 burglaries

   j.  2 Marijuana violations

   k.  4 Simple assaults

   l.  37 thefts.

80.     Quality Inn employees were aware of all or most of the above crimes because:

   a.  The police would typically tell motel employees why they had responded to the motel, particularly for the crimes that were non-theft crimes.

b. Motel guests who called police would often complain to motel employees about the crimes they had been victims of and were reporting to the police.

c. When police responded to these calls, the police were visible to motel employees.

### 4. Franchisor Training

81. In July 2015 or before, Choice Hotels had signed ECPAT's[2] "The Code of Conduct for the Protection of Children from Sexual Exploitation in Travel and Tourism," commonly known as "the Code." In signing, Choice Hotels committed to training employees of its hotels on preventing sexual exploitation of children.

82. Therefore, after signing the Code, Choice Hotels provided training on sex trafficking to its franchisees, such as employees of SC Hotel Investments LLC and Chandresh Patel, including training on the ECPAT's and Department of Homeland Security' common signs or "red flags" of sex trafficking, which include:

a. Frequent and/or consecutive guests in the hotel room

b. Minors appearing distressed, disoriented, or showing signs of abuse

c. Frequently requests for additional towels, new linens, etc., but refusing housekeeping in the room;

d. Many condoms in the trash;

e. Have few or no personal items;

---

[2] ECPAT (End Child Prostitution and Trafficking) is an acronym for a network of international organizations committed ending trafficking of children.

f.  Dress is inappropriate for climate/provocative dress;

g.  Use the "Do Not Disturb" sign constantly or refuse cleaning services for multiple days

83.    Thus, Chandresh Patel and other agents of SC Hotel Investments LLC knew the "red flags" of sex trafficking.

84.    Despite having this knowledge, Chandresh Patel continued the venture's policies and practices that encouraged sex trafficking at the motels.

**5. Industry Knowledge**

85.    Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

86.    Defendant knew or should have known of the existence and prevalence of sex trafficking at budget motels and its illegality since the passage of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, *et seq*., and publishing of the United Nations' Palermo Protocol to Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children, which was also passed in 2000.

87.    Defendant knew or should have known that in 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—although they may not be criminally liable under

the TVPRA—benefit from participation in a venture that they know or should know engages in sex trafficking.

88.     Defendant knew or should have known that, compared to other types of businesses, hotels play a critical role in sex trafficking ventures and serve as "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers[.]" *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2457 (2015) (Scalia, J., dissenting, joined by Chief Justice Roberts and Justice Thomas).

89.     In 2010 the Department of Homeland Security ("DHS") issued the guidance to hotel companies, entitled Human Trafficking and the Hospitality Industry,[3] which identified a number of warning signs indicating the presence of sex trafficking at hotels. According to DHS, hotel staff can and should be vigilant in observing signs of human trafficking including but not limited to, signs of poor physical appearance (injury, illness, poor hygiene, sleep deprivation, malnourishment), constant monitoring by others, requests for housekeeping and towels without entry into the room, presence of multiple computers or cell phones. Defendant knew or should have known of these warning signs and indicators.

90.     The End Child Prostitution and Trafficking (ECPAT-USA) published list of indicators of human trafficking for hotel staff to recognize and combat trafficking, such as:

---

[3] https://www.dhs.gov/blue-campaign/hospitalityindustry.

paying for rooms using cash, paying for multi-day stays one day at a time, escorts various men into the room and lingers until they leave, watching the door, room is frequented by different men, insists on little or no housekeeping, excessive requests for towels and sheets, wearing the same attire or attire that is revealing or inappropriate for the weather, excess lingerie, discarded condoms and lubricants, use of websites with adult classified ads and possessing few personal belongings. Defendant knew or should have known of these warning signs and indicators.

91. DHS has also previously provided education and guidance for the hospitality industry under the Blue Campaign, because of the hospitality industries' unique situation to identify and prevent of sex trafficking. Said guidance includes having hotel staff be vigilant for the following:[4]

    a. persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

    b. persons who lack freedom of movement or are constantly monitored;

    c. persons who have no control over or possession of money or ID;

    d. persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

    e. requests for room or housekeeping services (additional towels, new linens, etc.), but denial of hotel staff entry into the room;

---

[4] https://www.dhs.gov/blue-campaign/publication/blue-campaign-toolkits-and-guides.

f.   the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

g.   extended stay with few or no personal possessions in the room;

h.   excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

i.   the same person reserves multiple rooms;

j.   a room is rented hourly, less than a day, or for an atypical extended stay;

k.   attempts to sell items to or beg from patrons or staff;

l.   cars in the parking lot regularly parked backward, so the license plates are not visible;

m.   loitering and solicitation of male patrons; and

n.   persons asking staff or patrons for food or money.

Defendant knew or should have known of these warning signs and indicators.

92.   Defendant knew or should have known that commercial sex in a hotel environment, involving a "pimp," often involves sex trafficking.

93.   At all times relevant to this Complaint, the hospitality industry, which includes Defendant's motel, knew or should have known about its unique status to observe sex trafficking and the common signs thereof.

94.   At all times relevant to this Complaint, the hospitality industry, which includes Defendant's motel, knew or should know to implement reasonable training, policies, and procedures to observe for signs of sex trafficking.

95.     At all times relevant to this Complaint, the hospitality industry, which includes Defendant's motels, knew or should know to be vigilant for the above signs of sex trafficking and to take reasonable measures against the same (e.g. hire security, create policies of reporting crime, not accepting cash payments for rooms, training staff to notice signs sex trafficking, requiring I.D. for all guests, implement card readers, and implement policies whereby housekeeping must enters rooms after 48 hours and place new sheets and towels in rooms).

96.     Defendant knew or should have known that, without a venue, or crime scene, a sex trafficking venture ceases to exist.

97.     At all relevant times, Defendant knew or should have known that there was a heightened risk that sex trafficking could take place at its facility as compared to taking place at other locations because of: (i) extensive private sector / non-profit publications informing the public that motels were a hotbed of sex trafficking, (ii) extensive federal / state / local government testimony and press quotations informing the public that low income motels were a particular hotbed of sex trafficking, and (iii) the general nature of Defendant's business involving renting private rooms cheaply by the day with each room having a bed where trafficking could occur.

**d.  Information Regarding Defendant's Quality Inn, and Plaintiff's Experience was Not Unique.**

98.     Despite publicly attempting to appear to discourage the sex trafficking that Defendant knew was commonplace at the motel, Defendant did not make genuine efforts

to discourage the sex trafficking. Instead, Defendant chose to reap the increased room rentals revenue that the sex trafficking provided.

99. The following was commonplace at the motel, and upon information and belief, was well known to Defendant's employees at all times relevant to this Complaint:

    a.  Multiple women soliciting themselves on property and in the parking lot;

    b.  Pimps selling drugs in the parking lot;

    c.  The smell of marijuana pervasive throughout both the motel and parking lot;

    d.  Cars with "johns" coming, going, and passing the front desk after spending only 15 to 20 minutes at the motel at all hours of the night. This was not limited to those men coming to have sex with Plaintiff. Rather, upwards of 10 women and pimps at a time would have more than five (5) men coming and going from the property during peak nights, which created a high traffic environment that no one could miss.

100. To facilitate and cater to the criminal element at its motel, Defendant engaged in the following behaviors and procedures:

    a.  Defendant continued to rent rooms to those (i.e. Pratt) that it knew or should have known were engaged in the sex trafficking, and to place them in less conspicuous parts of the motel where police could easily monitor their activities;

    b.  Defendant maintained policies and systems whereby it would not call the police on those it knew or should have known were engaged in the sex

trafficking, thereby providing an environment where one could engage in sex trafficking without fear of detection or repercussion(s);

c. Defendant maintained policies and systems whereby housekeeping services could be suspended, thereby allowing traffickers and other criminals to avoid detection;

d. Defendant maintained policies and systems whereby towels and sheets could be dropped off at a guests' door or picked up in the lobby multiple times per day, many days in a row without question to allow for johns and traffickers comfort when engaging in commercial sex;

e. Defendant maintained policies and systems whereby housekeepers would not report the presence of a trashcan(s) full of used condoms and empty bottles of lubricant, and pimps surveilling rooms for weeks on end in exchange for tips;

f. Defendant maintained policies and systems whereby Defendant did not check all guests' I.D.s at the motel, thereby allowing women, young girls, and johns to come and go freely from the motel, which further facilitated pimps (e.g. Pratt) to conduct their business and avoid detection;

g. Upon information and belief, Defendant maintained policies and systems whereby it would allow guests to pay for rooms day-by-day and in cash to cater to the needs of traffickers like Pratt, who preferred to deal in cash;

h.  Defendant maintained policies and systems whereby their Wi-Fi could be used to post ads and pictures of women and girls available for sex. Additionally, Plaintiff noted that Pratt would post ads and pictures of her naked and underaged from Defendant's motel and, upon information and belief, their Wi-Fi;

i.  Defendant maintained policies and systems whereby staff would not call or report signs of sex trafficking, prostitution, or drug sales for the purpose of providing a space wherein those engaged in these activities would come back and rent rooms in order to engage in said vices; and

101.  Despite warnings from prior instances of trafficking, customer complaints, and apparent crime on the property that included drug sales in the parking lot, pimps monitoring rooms, and women selling themselves in the parking lot, Defendant did not change its above policies and systems despite the issues at the motel.

102.  Defendant maintained the policies and systems described above, following those warnings described above, to create an environment of low disruption and detection for criminality, to continue to attract those that would rent rooms to engage in illegal activity (like sex trafficking, drug use, and prostitution), and for the purpose of profiting from those rooms rentals.

103.  Defendant maintained the above policies and systems and provided Pratt a friendly welcome despite numerous warnings and red flags about both Plaintiff individually and the Quality Inn as a whole, thereby facilitating and participating in

Plaintiff's sex trafficking, providing a venue where Plaintiff's sex trafficking could occur, and creating a tacit agreement between Defendant and Pratt to profit from a sex trafficking operation that all knew or should have known about.

### e. Defendant's Knowledge as to Plaintiff

104.　Defendant directed, operated, supervised, monitored, managed, and/or employed all employees, managers, housekeepers, and other staff at the motel at all relevant times, giving Defendant specific and direct knowledge of sex trafficking, including the sex trafficking that victimized A.M., and other crimes at the motel during the relevant period.

105.　Moreover, Chandresh Patel developed specific knowledge about sex trafficking on Queen City Drive from information that he received from the police regarding the Red Roof Inn and the information he received from the government in the *in rem* action relating to the Red Roof. The knowledge that Patel gained is attributable to Defendant because Patel was an agent of the Defendant—the main agent who made key decisions regarding hotel practices and policies.

106.　Defendant and its employees were warned by online reviews, customer complaints, and police about the high presence of drugs sales, prostitution, and violent crime at the motel prior to Plaintiff's trafficking period.

107.　Defendant knew and should have known that other women displayed the same signs of trafficking at its motel prior to Plaintiff being there. However, Defendant similarly profited from said women.

108.    Defendant knew and should have known that Plaintiff displayed the following signs of sex trafficking at all times relevant to this Complaint:

   a.    Plaintiff did not interact with Defendant employee and would keep her head down when in view of Defendant's employees;

   b.    Plaintiff was dressed provocatively for her age;

   c.    Plaintiff appeared bruised in addition to being underaged and dressed provocatively while in the presence of Defendant's employees;

   d.    Plaintiff appeared under the influence of drugs and alcohol (i.e. glossy-eyed, smelling of marijuana, and swaying) while in the presence of Defendant's employees;

   e.    Plaintiff and her trafficker went days without housekeeping services;

   f.    Despite foregoing housekeeping services, Plaintiff's trafficker would request towels and sheets multiple times a day that had to either be left at the motel room door or picked up by Plaintiff's trafficker in the lobby;

   g.    Because housekeeping had been forgone for days at a time, Plaintiff's trafficker would leave behind trash can(s) full of used condoms upon checkout;

   h.    Plaintiff's trafficker would arrange for many men per night to drive past the front office in clear view of Defendant's employees, park in the parking lot, stay at Defendant's motel only 15 to 20 minutes while they had sex with A.M., before once again driving past the front desk in clear view as they left;

i.  Plaintiff's trafficker would become angry and abusive towards Plaintiff, and yell or be violent, in a manner that others, including motel staff, could hear.

109.  Defendant knew and should have known that the motel was the subject of:

a.  Multiple women soliciting themselves on the property and in the parking lot;

b.  Pimps selling drugs in the parking lot;

c.  The smell of marijuana pervasive throughout both the motel and parking lot;

d.  Cars with "johns" coming, going, and passing the front desk after spending only 15 to 20 minutes at the motel at all hours of the night.

110.  Defendant knew and should have been aware that the above are signs of trafficking in the hospital industry such that thew knew or should have known of Plaintiff's trafficking.

111.  Defendant knew and should have known that there were reviews online and customer complaints stating there are drug sales at the motel and prostitutes soliciting themselves at the motel.

112.  Defendant should have known that by failing to correct or warn of the condition at its property (i.e. allowing crime to reign freely and without consequence for the sake of profit) it made Plaintiff's trafficking and multiple rapes foreseeable.

113.  Defendant knew and should have known that it had to implement at the Quality Inn the suggestions that the Charlotte Mecklenburg Police Department made for the Red Roof Inn, or implement other reasonable measures (i.e. requiring I.D.'s for all patrons, not allowing 15 to 20-minute visits to the motel; requiring housekeeping services

every 48 hours; requiring employees to call the police upon suspicion of drug use or prostitution, and other crimes and be trained to recognize the same).

114.    But Defendant chose not to implement such measures.

### IV.   COUNT 1: TVPRA CIVIL BENEFICIARY CLAIMS

115.    The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) ("TVPRA") provides a civil cause of action to victims like A.M. against "[whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter. . ."

116.    Plaintiff alleges two ventures, both of which engaged in an act in violation of 18 U.S.C. § 1591 as to Plaintiff.

### a.  Venture 1 (Defendant and Traffickers)

117.    Defendant took part in a common undertaking involving risk or profit with Plaintiff's traffickers because:

  a.  Defendant directly rented rooms to Pratt for which it  received money and/or United States currency;

  b.  Defendant directly rented rooms to Pratt when it knew or should have known Pratt was engaged in sex trafficking Plaintiff and the 17-year-old girl;

  c.  After renting rooms to Pratt, when Defendant knew or should have known Pratt was engaged in sex trafficking Plaintiff, Defendant continued its business relationship with Pratt by continuing to rent rooms to him while it

knew or should have known he was engaged in sex trafficking Plaintiff and the 17-year-old;

d.  Defendant had a continuous business relationship with Plaintiff's traffickers (Pratt, his "bottom," and his associates) such that Defendant established a pattern of conduct with those traffickers;

e.  After renting the room for the first night, Plaintiff's traffickers had prior commercial dealings with Defendant and then reinstated those dealings;

f.  Defendant associated with Plaintiff's trafficker(s) in an effort to force Plaintiff to serve Defendant's business objectives;

g.  Defendant steered Plaintiff's trafficker(s) to certain areas of the motel where it was less likely they would be found by law enforcement.

h.  Upon information and belief, Defendant instructed staff not to call the police about crime and criminal acts on the property;

i.  Defendant owned, operated, and maintained the Quality Inn in question; and

j.  On every occasion Defendant rented Pratt a room, it received money and/or United States currency in exchange.

118.  Defendant "knowingly benefited" from A.M.'s trafficking because:

a.  Pratt rented rooms at the Quality Inn; and

b.  Defendant collected revenue from the room rentals by accepting payment for said rooms.

119.     Plaintiff's traffickers' undertaking with Defendant violated the TVPRA with respect to Plaintiff because:

a.  Plaintiff's traffickers forced Plaintiff to participate in commercial sex acts at Defendant's motel by, among other reasons, hitting her and threatening acts of violence against her and her family;

b.  Pratt kept Plaintiff under his control and in a repeated pattern of having to participate in commercial sex acts at the Quality Inn by, among other methods, not allowing A.M. access to money and keeping her under a cocktail of drugs;

c.  Plaintiff's traffickers harbored Plaintiff at the Quality Inn for the purpose of Plaintiff participating in commercial sex acts at the property;

d.  The traffickers transported Plaintiff to the Quality Inn for the purpose of Plaintiff participating in commercial sex acts at the motel;

e.  The commercial sex acts occurred at the Quality Inn in rooms rented by Plaintiff's traffickers;

f.  Pratt used force, threats of force, fraud, and coercion to cause Plaintiff to participate in commercial sex acts at the Quality Inn;

g.  Pratt threatened Plaintiff with violence and used this tactic to cause Plaintiff to engage in commercial sex acts at the Quality Inn;

h.  Pratt defrauded Plaintiff by falsely telling Plaintiff that he would take care of Plaintiff and make her money, and then forcing Plaintiff to be sold for sex at the Quality Inn;

i.  The traffickers knowingly, recruited, enticed, harbored, transported, advertised, maintained, and solicited Plaintiff to engage in commercial sex acts in the Quality Inn rooms that the traffickers rented from Defendant;

j.  Buyers came to the Quality Inn, purchased the "right" to have sex with Plaintiff from her trafficker, and then the buyers raped Plaintiff at the Quality Inn;

k.  Plaintiff's traffickers were aware that A.M. was not yet eighteen years of age but nevertheless sold her for commercial sex at the Quality Inn;

l.  The traffickers utilized Defendant's wireless internet connection to arrange for the commercial sex acts and post nude or partially nude photos of under-aged Plaintiff; and

m.  Other actions to be proven at trial.

120.  The venture in which Defendant participated affected interstate commerce for numerous reasons including the sale and use of condoms, the purchase and use of cleaning supplies from out of state, the use of interstate highways to transport Plaintiff to the Quality Inn by her trafficker (and his associates), and other reasons to be proven at trial.

121.  As shown above, Defendant had – at minimum – constructive knowledge that Plaintiff was being trafficked for sex at the Quality Inn.

122.  Defendant directed, operated, supervised, monitored, managed, and/or employed all employees, managers, housekeepers, and other staff at the Quality Inn at all relevant times, giving Defendant specific and direct knowledge of sex trafficking, including the sex trafficking that victimized Plaintiff, and other crimes at the motel during the relevant period.

123.  Defendant directed, operated, supervised, monitored, managed, and/or employed all employees, managers, housekeepers, and other staff at the Quality Inn and, Chandresh Patel and other Defendant agents had specific and direct knowledge of what sex trafficking and its signs looked like.

**b. Venture 2 (Queen City Drive Motels)**

124.  Plaintiff also alleges commercial venture involving the Patel's management and ownership of the two Queen City Drive motels—the Quality Inn and the Red Roof Inn. The Patels took part in a common undertaking involving risk or profit to run the motels to maximize profits for themselves. That venture included the following participants;

      a.  Chandresh and Alpa Patel

      b.  Shreeji Hospitality Queen City LLC

      c.  SC Hotel Investments LLC

      d.  The Sales Director charged with marketing and overseeing the motels

      e.  Employees of SC Hotel Investments LLC

      f.  Employees of Shreeji Hospitality Queen City LLC

125.     This venture ("the Queen City Motels Venture") is a commercial venture to maximize room rental revenue from the Patel's ownership, control and management of the Quality Inn and the Red Roof Inn located next to each other on Queen City Drive.

126.     The Queen City Venture is a common undertaking involving risk or profit because:

    a.     Chandresh Patel (along with his wife) owned and controlled both and ran them with the same policies and the same oversight staff;

    b.     Chandresh Patel used the same Sales Director to promote, market, and oversee the motels.

    c.     Chandresh Patel used the same security personnel at both motels;

    d.     All participants followed Chandresh Patel's policies and instructions, which had the same common purpose—maximizing profits for Mr. Patel and his wife, which meant maximizing gross room revenue.

    e.     When the venture was no longer viable and was under pressure from federal and local law enforcement to stop facilitating commercial sex, Chandresh Patel devested of both motels as soon as practicable.

127.     One or more participants in the Queen City Venture violated the TVPRA with respect to Plaintiff because:

    a.     Chandresh Patel, Shreeji Hospitality Queen City LLC, and/or SC Hotel Investments LLC violated 18 U.S.C § 1591(a)(l) by harboring sex trafficking; and

b. All of the participants, but particularly Chandresh Patel, had actual knowledge of widespread sex trafficking at the motels, violated 18 U.S.C § 1591(a)(2) by knowingly facilitating such trafficking at the Quality Inn and the Red Roof Inn, including by knowingly renting rooms to traffickers and collecting room rental.

128. Defendant "knowingly benefited" from its participation in this venture because:

a. Pratt rented rooms at the Quality Inn; and

b. Defendant collected revenue from the room rentals by accepting payment for said rooms and rooms rented by other traffickers.

129. This venture in which Defendant participated affected interstate commerce for numerous reasons including the rental of motel rooms to interstate travelers, the purchase and use of cleaning supplies from out of state, and other reasons to be proven at trial.

## V.   COUNT 2: PREMISES LIABILITY LAW

130. Defendant owed a duty to Plaintiff to exercise ordinary care in keeping the premises and approaches of the motel safe and to not negligently create and maintain the condition(s) that caused her injury.

131. Defendant had actual and constructive knowledge of criminal activity at the motel that made the repeated raping of Plaintiff foreseeable to Defendant.

132. Defendant knew or should have known of steps to take to prevent the motel from being used as a venue for sex trafficking, rape, forced drug use, assault, and other crimes perpetrated on Plaintiff but negligently failed to correct the conditions or warn Plaintiff.

133. Defendant was negligent and said negligence proximately caused Plaintiff's injuries in the following ways:

    a. Failing to use ordinary care to keep the premises safe;

    b. Negligently failing to provide appropriate and effective security personnel during Plaintiff's sex trafficking at the motel;

    c. Negligently failing to properly inspect and maintain the premises;

    d. Negligently failing to properly train and supervise its employees regarding sex trafficking and other sex crimes at the motel;

    e. Negligently failing to properly retain, hire, train, and supervise said employees;

    f. Negligently failing to ensure business policies, systems, and security were adequately followed and implemented;

    g. Negligently failing to respond to online reviews and publicly available information;

    h. Negligently failing to prevent loitering, pandering, prostitution and trespassing;

i. Negligently failing to remove loiterers, panderers, prostitutes, pimps and trespassers;

j. Negligently failing to inspect, patrol, or appropriately monitor the property;

k. Negligently failing to provide adequate lighting and employ other available security measures, personnel, and devices, such as controlled access, adequate signage, cameras, patrols, inspections, physical, and other landscaping adjustments, and other measures available;

l. Negligently failing to remediate a long history of crime at the motel;

m. Negligently failing to warn invitees of known hazards at the property;

n. Negligently representing to invitees that the property was safe; and

o. Other negligent acts that violated North Carolina common law to be proved at trial.

134. Defendant also had a duty NOT to aid in the creation of, and NOT to maintain, a continuous and regularly repeated dangerous criminal condition at the motel.

135. Defendant was aware of the dangerous criminal condition at the motel and negligently allowed that condition to continue.

136. Defendant maintained a dangerous, criminal condition at the motel, which caused Plaintiff to be repeatedly sexually assaulted and raped at the motel, and Plaintiff seeks to recover for that sexual abuse.[5]

---

[5] Under N.C. Gen. Stat. 1-17(d), "a plaintiff may file a civil action against a defendant for claims related to sexual abuse suffered while the plaintiff was under 18 years of age until

## VI. CAUSATION AND DAMAGES

137.    Each of the forgoing acts and omissions constitute an independent act of negligence on the part of Defendant, and one or more or all of the above stated acts were the proximate causes of the injuries and damages sustained by the Plaintiff.

138.    As a direct and proximate result of Defendant's acts and omissions, Plaintiff suffered substantial physical, emotional, and psychological harm and other damages.

139.    Defendant is liable for Plaintiff's damages in an amount to be proven at trial, including reasonable attorneys' fees under 18 U.S.C. § 1595(a) and punitive damages.

140.    Plaintiff brings each and every claim for damages permissible under the law against Defendant for injuries suffered in the incident at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, and all compensatory, special, actual, general, and punitive damages permissible under the law, including, but not limited to:

     a.    Actual damages;

     b.    Direct damages

     c.    Personal injuries;

     d.    Past, present and future pain and suffering;

     e.    Disability;

     f.    Disfigurement;

---

the plaintiff attains 28 years of age." Here, Plaintiff A.M. was 15 at the time of the sexual abuse, and she is currently 25.

g. Mental anguish and emotional distress (until trial and in the future);

h. Loss of the capacity for the enjoyment of life;

i. Loss of earning capacity;

j. Physical pain and suffering;

k. Emotional impairment;

l. Unjust enrichment;

m. Penalties;

n. Lost wages;

o. Diminished capacity to labor;

p. Incidental expenses;

q. Past, present and future medical expenses;

r. Pre- and post-judgment interest at the maximum legal rates;

s. Permanent injuries; Attorney's fees;

t. Punitive damages;

u. Exemplary Damages; and

v. Consequential damages to be proven at trial.

## VII. JURY TRIAL

141.     Plaintiff demands a jury trial on all issues.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment against Defendant and for the following:

1)     That process and summons issue requiring Defendant to appear as provided by law to answer the allegations of the Complaint;

2)     Plaintiff be awarded actual damages in amounts to be shown at trial against Defendant;

3)     Plaintiff be awarded all general, special, compensatory, economic, and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendant;

4)     Plaintiff be awarded her attorneys' fees and case expenses as allowed by law;

6)     Punitive damages be imposed upon Defendant;

7)     Plaintiff be provided with a trial by jury; and

8)     Plaintiff have such other relief as this Court deems just and appropriate under the circumstances.

This 9th day of February 2026.

**THE STODDARD FIRM**
*/s/ Matthew B. Stoddard*
Matthew B. Stoddard, Esq.
North Carolina Bar No. 62220
THE STODDARD FIRM
1534 N Decatur Road
Atlanta, GA 30307
P: 470-467-2200
F: 470-467-1300
matt@LegalHelpGa.com
***Attorneys for Plaintiff***